# REHABILITATION SPECIALISTS OF CHICAGO, LLC
## EMPLOYMENT AGREEMENT

This **Employment Agreement** ("Agreement") is entered into as of this 31 day of October, 2009, by and between **Rehabilitation Specialists of Chicago, LLC** ("Company") and **Ahmed Elgamal, M.D.** ("Provider").

### WITNESSETH:

**WHEREAS**, Company is a limited liability company employing physicians who provide rehabilitation medical services to the residents of the greater Chicagoland area;

**WHEREAS**, Provider is a physician who holds an unrestricted license to practice medicine in the State of Illinois and is Board certified/Board eligible in physical medicine and rehabilitation; and

**WHEREAS**, Company and Provider desire to enter into an employment relationship whereby Provider will be employed by Company to provide certain medical services pursuant to the terms and conditions set forth below.

**NOW, THEREFORE**, in consideration of the mutual covenants as contained herein, the parties agree as follows:

## ARTICLE I
## EMPLOYMENT AND PROFESSIONAL SERVICES

1.1   Employment. Company hereby employs Provider, and Provider accepts such employment, to provide the professional medical services described in Section 1.3 below (the "Medical Services") and the administrative services described in Section 1.4 below (the "Administrative Services") on behalf of Company pursuant to this Agreement. Provider shall render Medical Services at such hospitals, surgical centers, imaging centers, physician offices and other facilities as may be determined by Company and consistent with Provider's clinical privileges thereat. In rendering Medical Services and Administrative Services hereunder, Provider shall at all times be subject to the direction of and accountable to Company's Board of Managers or its designee.

1.2   Exclusive Practice. Provider agrees to provide Medical Services on an exclusive basis, in accordance with the regular or special call schedules published by the Company from time to time, and consistent in time and scope with the usual and customary work schedules of the Company's other providers, less time allowed for vacation and such other paid or unpaid leave as may be granted to Provider in accordance with the Company's compensation and benefits policies, as they may exist from time to time during the term hereof. During the term hereof, Provider shall not render professional medical services for remuneration of any kind (including, without limitation, fees for medical care, teaching, medical administration, lecturing and honorariums for any services) other than as required hereunder without having sought and obtained the written permission of the Company. All remuneration received as a result of providing professional medical services from whatever source derived shall belong to and if received by Provider shall be promptly turned over to the Company.

CHICAGO/#1200562.1



EXHIBIT A

Document received on 2016-08-09-14.49.57.0  Document accepted on 08/09/2016 15:39:50 # 3859420/17043550703

1.3 _Medical Services_. Provider shall provide the following Medical Services:

a. Deliver all necessary and appropriate professional medical services to patients of the Company usually and customarily provided by physicians specializing in rehabilitative medicine;

b. Provide on-call coverage as reasonably requested by Company and as mutually arranged with Company's other providers;

c. Assist Company in maintaining accurate and complete records of all Medical Services provided by Provider to patients of the Company;

d. Participate in the development and implementation of a quality assessment program consistent with the needs of the Company for accreditation, licensure or other desired purposes; and

e. Provide such other professional medical services for patients of the Company as may be reasonably requested by Company or routinely required from time to time during the term hereof.

1.4 _Administrative Services_. Provider shall provide the following Administrative Services in cooperation with Company's other providers:

a. Comply with applicable policies and requirements of licensing, regulatory, and accrediting bodies relative to Company and the Medical Services it provides;

b. Submit timely and accurate information to permit the Company to bill its patients or third-party payors for Medical Services provided hereunder, execute appropriate assignments or other documentation to enable Company to bill and collect for the Medical Services rendered by Provider hereunder and otherwise assist Company as needed with billing matters, including Medicare and Medicaid, and private third-party payors;

c. Maintain effective liaison with physicians who may require Medical Services;

d. Participate in and abide by the Company's quality assessment and other review programs;

e. Participate in and abide by the Company's corporate compliance program and notify a member of Company's Board of Managers or the corporate compliance officer, if appointed, of any concerns Provider may have regarding Company's compliance with federal or state laws relating to the billing for or documentation of Medical Services provided by Company, including concerns regarding information provided by a third party that could affect Company's compliance; and

f. Abide by Company's rules, policies and procedures and perform other administrative duties and responsibilities as may be reasonably requested by Company.

CHICAGO/#1200562.1

- 2 -

Document received on 2016-08-09-14.49.57.0 Document accepted on 08/09/2016 15:39:50 # 3859420/17043550703

1.5     Managed Care Programs. Provider shall participate in Medicare/Medicaid and all other payor programs, contracts and plans, including managed care plans (such as HMOs and PPOs) that Company deems appropriate, and hereby agrees to abide by the requirements of such programs, contracts and plans. All such programs, contracts and plans shall be entered into in the name of the Company and only as approved by Company.

1.6     Physician Provider Qualifications. Throughout the term of this Agreement, Provider shall: (a) hold a valid and unrestricted license to practice medicine in the State of Illinois; (b) be certified or eligible by the American Board of Physical Medicine and Rehabilitation; (c) remain current in the practice of rehabilitative medicine; and (d) fulfill all requirements that payors contracting with the Company may place upon participating providers from time to time.

1.7     Hospital Privileges/Compliance with Law. Provider shall maintain in good standing appropriate privileges at Ingalls Hospital ("Hospital") and such other health care institutions or facilities as deemed appropriate or necessary by the Company. Provider shall comply with the bylaws, policies and procedures of Hospital and all other health care institutions and facilities in which privileges are held. Provider agrees that all Medical Services provided pursuant to this Agreement shall be performed in compliance with all applicable federal, state and local laws, rules and regulations and all professional standards governing such Medical Services.

1.8     Practice of Medicine. The parties acknowledge that the Medical Services to be performed by Provider shall be the sole responsibility of Provider, based upon Provider's independent, professional judgment, and that Company shall neither have nor exercise any control or direction over the methods used by Provider in the performance of said Medical Services, except that, Provider shall be subject to the supervision of the Company's Board of Managers.

1.9     Conflict of Interest. Unless otherwise agreed upon in writing, Provider shall provide all Medical Services exclusively through Company and shall not accept employment or contractual obligations with any other entity, organization or individual providing Medical Services without Company's prior written approval. In addition, Provider shall not have any ownership interest in any organization providing Medical Services or any other health-related service (other than an investment interest in less than 5% of a publicly traded company) without Company's prior written approval.

## ARTICLE II
## OBLIGATIONS OF COMPANY

2.1     Billing and Collection. Company shall determine, bill and collect any fees and charges generated by Provider pursuant to this Agreement for Medical Services, including those Medical Services covered by the Medicare and Medicaid programs. Company shall be responsible for collection of such fees; however, Provider shall cooperate with and assist Company in the collection of such fees and charges. Provider hereby assigns to Company all rights to revenues attributable to the Medical Services rendered by Provider hereunder. If any

Document received on 2016-08-09-14.49.57.0 Document accepted on 08/09/2016 15:39:50 # 3859420/17043550703

revenues from Medical Services are received by Provider directly, said amount shall be promptly turned over to Company.

2.2 Professional Liability Insurance. Company shall provide medical malpractice insurance with respect to the provision of Medical Services as contemplated herein. Provider shall only be covered by such professional liability coverage while acting within the scope of employment with Company. Such coverage shall not apply to those acts which occurred prior to Provider's employment, and Provider shall retain coverage for such acts.

## ARTICLE III
## COMPENSATION, BENEFITS, BILLING, AND ASSIGNMENT

3.1 Compensation. In consideration of the Medical Services to be rendered by Provider hereunder, Company agrees to pay Provider an annual base salary of **One Hundred Twenty-five Thousand Dollars ($125,000.00)** for full-time service to Company, plus incentive compensation as determined in accordance with Exhibit A attached hereto and by reference made part hereof, as it may be amended from time to time during the term hereof. Service less than full-time in any year during the term hereof, may, at Company's option, cause the base compensation for that year to be pro-rated accordingly. Base compensation may be increased or decreased by the Company's Board of Managers from time to time during the term hereof to reflect the economic conditions in which the Company operates; provided, however, that such adjustments shall be uniform among all provider-employees of the Company. Compensation shall be payable in regular periodic installments consistent with Company's payroll policies as may be in effect from time to time.

3.2 Expenses. Company may provide reimbursement for reasonable expenses incurred by Provider relating to the business of the Company as it deems appropriate and in its sole discretion. Provider shall repay or reimburse Company for all taxes, penalties and interest resulting from the denial of such reimbursement as an allowable business expense of the Company by the Internal Revenue Service. Such reimbursement shall not be deemed compensation to Provider for purposes of Section 3.1. Company shall pay Provider's annual AAPMR membership dues.

3.3 Employee Benefits. Provider shall be entitled to those employee benefits as may be provided from time to time during the term hereof by the Company in accordance with the terms of such benefit policies or plans. Company shall advise Provider of any changes in the benefits provided by it during the term hereof.

3.4 Paid Vacation. Provider shall be entitled to a total of four (4) weeks of paid vacation time during each year of employment. Vacation time shall be earned ratably on a monthly basis. Vacation time not actually taken by Provider shall not be accumulated beyond the calendar year in which Provider was entitled to such vacation time. In addition, provider shall be entitled to one (1) week of paid time off for attendance at professional meetings, seminars or conventions approved in advance by the Board of Managers. Provider's vacation and attendance at approved educational meetings shall be scheduled at such time as will least interfere with the business of Company, as determined in the sole discretion of the Board of Managers.

CHICAGO/#1200562.1

- 4 -

Document received on 2016-08-09-14.49.57.0 Document accepted on 08/09/2016 15:39:50 # 3859420/17043550703

# ARTICLE IV
# TERM AND TERMINATION

4.1 Term. The term of this Agreement shall commence on the 4 day of **January, 2010** and shall continue for a term of one (1) year. Unless otherwise terminated pursuant to the terms hereof, this Agreement shall automatically renew for successive one-year periods

4.2 Termination. This Agreement may terminate earlier than the expiration of any term hereof, upon the earliest to occur of the following events:

    a. Termination by Agreement. This Agreement may be terminated at any time upon the terms set forth in a written document signed by both parties.

    b. Termination Without Cause. Company may terminate this Agreement, at any time, by furnishing Provider with ~~ninety~~ (60) days prior written notice of such termination. Provider may terminate this Agreement, at any time, by furnishing Company with one hundred twenty (90) days prior written notice of such termination. The parties acknowledge and agree that the failure of Provider to provide the notice required hereunder will jeopardize Company's ability to provide services to its patients and otherwise cause irreparable damage to Company. Therefore, Company shall be entitled to claim and recover as liquidated damages hereunder from Provider, an amount equal to the amount of compensation Provider would have been entitled pursuant to Section 3.1 attributable to the period during which Provider's notice was delinquent. For example, if Provider only gives thirty (30) days notice prior to his/her termination of the Agreement, he or she will be liable to pay Company an amount equal to that portion of compensation to which he or she would have been entitled with respect to ~~ninety (60)~~ SIXTY days of employment.

    c. Termination For Cause. Either party may terminate this Agreement for cause upon ten (10) days notice of such termination in the event the other party fails by omission or commission to perform such party's obligations hereunder in any material and substantial manner (a "Default") and fails to cure said Default within a period of thirty (30) days after receipt of written notice of such Default; provided, however, that a third Default by either party is grounds for immediate termination of this Agreement by the other party without the opportunity to cure the Default.

    d. Immediate Termination. Company may terminate this Agreement, at its sole option, immediately upon providing written notice to Provider, in the event that one or more of the following occurs: (i) Provider is accused of a felony or offense involving moral turpitude; (ii) Provider's license is suspended, revoked or limited; (iii) Provider breaches a fiduciary responsibility to the Company, including the failure to turn over promptly any remuneration received for the rendering of professional medical services, or otherwise engaging in fraud with or embezzlement from the Company; (iv) Provider performs Medical Services or other professional medical services for remuneration outside this Agreement without the prior written approval of the Company; (v) Provider has an ownership interest in an organization providing Medical Services or other health-related services (other than an ownership interest in less than 5% of a publicly-traded company and other than an ownership or membership interest in the Company) without the prior written approval of the Company; (vi) Provider no longer can be

Document received on 2016-08-09-14.49.57.0 Document accepted on 08/09/2016 15:39:50 # 3859420/17043550703

insured on the same policy as other providers employed by Company; (vii) Provider no longer is Board certified/eligible in physical medicine and rehabilitation; (viii) Provider no longer meets the requirements placed upon participating providers by payors contracting with the Company; (ix) Provider's privileges at Hospital or such other health care institutions or facilities as may have been deemed appropriate or necessary by the Company are revoked, suspended or reduced; (x) Provider breaches his duty of confidentiality under Section 5.3 hereof; or (xi) Provider ceases to work at least forty (40) hours per week.

        e.    Termination Upon Death/Disability. This Agreement shall automatically and immediately terminate without notice upon Provider's death. In the event Provider becomes disabled and is unable to perform the essential functions hereunder, compensation by the Company (except for amounts, if any, already accrued to Provider as compensation for services hereunder) and his/her employment shall continue for one hundred eighty (180) days and after a continuous period of three hundred sixty five (365) days disability with or without reasonable accommodation, Company may terminate his/her employment and this Agreement; provided, however, any days of disability separated by thirty (30) days or less shall be considered continuous.

4.3    Effect of Termination. Upon termination of this Agreement, neither party shall have any further obligation hereunder except for:

        a.    Obligations accruing prior to the date of termination; and

        b.    Obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement.

4.4    Covenant Not to Compete. Upon termination, Provider shall not provide Medical Services, directly or indirectly, for a period of two (2) years within a ten (10) mile radius of Hospital or any health care facility affiliated with Hospital at which Company has provided medical services during the term hereof, without first obtaining the written consent of the Company. The parties agree that this restriction is reasonable and that violation of this Section 4.4 will cause Company to suffer irreparable damages. Provider acknowledges that the failure to comply with the terms of this Section 4.4 will cause irreparable damage to the Company and, therefore, Provider agrees that, in addition to any other remedies at law or in equity available to Company for Provider's breach or threatened breach of his covenant, Company shall be entitled to specific performance or injunctive relief against the Provider to prevent such damage or breach, and the existence of any claim or cause of action that Provider may have against Company will not constitute a defense thereto. Provider further agrees to pay reasonable attorneys' fees incurred by Company in any proceeding relating to the enforcement of the Provider's covenant or to any alleged breach thereof in which the Company shall prevail in whole or in part.

### ARTICLE V
### MISCELLANEOUS

5.1    Access to Books and Records. The parties agree to treat this Agreement as a "contract" within the purview of § 1861(v)(1)(I) of the Social Security Act (§ 952 of the

- 6 -

Document received on 2016-08-09-14.49.57.0  Document accepted on 08/09/2016 15:39:50 # 3859420/17043550703

Omnibus Reconciliation Act of 1980) and the regulations promulgated in implementation thereof at 42 I.E. Part 420, and for four (4) years after the furnishing of services hereunder, to make available to the Comptroller General of the United States, the Department of Health and Human Services and their duly authorized representatives, access to the books, documents, and records and such other information as may be required by the Comptroller General or Secretary of HAS to verify the nature and extent of the costs of services provided by Provider. If Provider carries out the duties of the contract through a subcontract worth $10,000.00 or more over a twelve (12) month period with a related organization, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller General, and their representatives to the related organization's books and records.

5.2 Assignment. Neither this Agreement nor the rights or obligations hereunder shall be assigned by Provider.

5.3 Confidentiality. Provider agrees that the terms and conditions of this Agreement shall remain confidential. Provider shall not distribute this Agreement or any part thereof or reveal any of the terms of this Agreement to parties other than a spouse, legal or accounting advisor, agent, or as may be otherwise required by law. Further, Provider shall not disclose any proprietary data or other confidential information of the Company, which shall include, but not be limited to, the following: Company's business documents and financial methods and practices, pricing and marketing techniques, file or data base materials, computer programs, lists of patients or referring physicians and data on suppliers. As long as such matters remain proprietary data or other confidential information of the Company, Provider will not disclose or use such data or information in any way or in any capacity other than to further Company's interests. This provision shall survive the termination of this Agreement, regardless of the cause thereof. Notwithstanding any confidentiality obligations to the contrary, the taxpayer (and each employee, representative, or other agent of the taxpayer) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to the taxpayer relating to such tax treatment and tax structure.

5.4 Entire Agreement; Modification. This Agreement constitutes the entire agreement of the parties concerning the subject matter hereof and supersedes all previous representations, understandings, and agreements of the parties, whether oral or written, concerning same. This Agreement may only be modified by a written document signed by the parties hereto.

5.5 Governing Law. This Agreement shall be construed pursuant to the laws of the State of Illinois.

5.6 Notices. All notices required to be given under this Agreement shall be in writing. A notice shall be deemed to have been given at the time when mailed by U.S. Mail or hand delivered. Notices shall be given for each party to the individual and address listed below unless notice is given otherwise:

If to Company:

Document received on 2016-08-09-14.49.57.0 Document accepted on 08/09/2016 15:39:50 # 3859420/17043550703

Rehabilitation Specialists of Chicago, LLC
One Ingalls Drive
Harvey, Illinois 60426
Attention: Dr. Michael Marinko

If to Provider:

Ahmed Elgamal, M.D

_____
_____

5.7 Severability. In the event that any provision hereof is found invalid or unenforceable pursuant to judicial decree or decision, the remainder of this Agreement shall remain valid and enforceable according to its terms.

5.8 Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provisions hereof.

IN WITNESS WHEREOF, Provider and Company, by its duly authorized officer, have executed this Agreement as of the date first above written.

| REHABILITATION SPECIALISTS OF CHICAGO, LLC | Ahmed Elgamal, M.D. |
|---|---|
| "Company" | "Provider" |

By: _____
Title: _____

Document received on 2016-08-09-14.49.57.0   Document accepted on 08/09/2016 15:39:50 # 3859420/17043550703

## OVER $300,000EXHIBIT A

### Production Bonus

Provider shall be entitled to a production bonus based on the following table with respect to collections generated by Provider and actually paid to Company, such calculation to be determined in Company's sole discretion:

| Provider Collections | Incentive Bonus |
|---|---|
| Over $300,000 | 50% of all such collections |
|  |  |

CHICAGO/#1200562.1

Document received on 2016-08-09-14.49.57.0   Document accepted on 08/09/2016 15:39:50 # 3859420/17043550703